# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Personal
Restraint Petition of

MARK J. GOSSETT,

           Petitioner.

)
)
)
)
)
)
)
)

NO. 71435-0-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: March 31, 2014

LAU, J. — In this personal restraint petition (PRP), Mark Gossett challenges his convictions in Thurston County Superior Court No. 08-1-02102-9, seeking a new trial based on denial of effective assistance of counsel at trial, denial of effective assistance of counsel on appeal, and prosecutorial misconduct in closing argument. Gossett acknowledges that he raised the ineffective assistance of trial counsel and prosecutorial misconduct issues on direct appeal, but he now asserts the same arguments supported by different facts and contends appellate counsel was ineffective for inadequately arguing the issues on direct appeal. Because Gossett's ineffective assistance of trial counsel and prosecutorial misconduct claims lack merit, he fails to show that appellate counsel's performance on direct appeal constituted ineffective assistance. We deny Gossett's PRP.

FACTS

Mark Gossett is currently serving a term of 245 months' confinement following his conviction by jury of two counts of second degree rape of a child and two counts of second degree child molestation of his adopted daughter AG. The facts of this case are fully discussed in Gossett's direct appeal. State v. Gossett, noted at 167 Wn. App. 1011, 2012 WL 830507. In sum, AG and her biological sister SG were placed as foster children in Mark and Linda Gossett's home in June 2000. In December 2001, the Gossetts adopted the sisters. According to AG, life at the Gossetts' home changed dramatically after the adoption. The Gossetts were strict and used corporal punishment to discipline AG.

In January 2008, after an argument with Linda,[1] AG moved in with Jennifer Myrick, a woman she had met at the Gossetts' church. In June 2008, AG told Myrick and Myrick's best friend, Roberta Vandervort, that Gossett had sexually abused her. AG told Myrick and Vandervort that the abuse began around the time she was in eighth grade.

In July 2008, AG met with Thurston County Deputy Sheriff Kurt Rinkel and told him that Gossett began touching her in eighth grade. AG turned 14 in November of her eighth grade year. AG also told Sergeant Evans on two occasions that the sexual abuse started when she was 14 years old. In November 2008 the State charged Gossett with two counts of second degree child rape (domestic violence) and two counts of second degree child molestation (domestic violence).

---

[1] For clarity, we refer to Linda Gossett by her first name and Mark Gossett as "Gossett."

During pretrial proceedings and at trial, the defense raised AG's failure to report and delay in reporting the sexual abuse. In March 2010, the defense moved to exclude "the testimony of Kelly Jones, whom the State intends on calling as an expert witness for purposes of testifying with respect to the potential delay in reporting of victims of child rape." In the declaration supporting the motion, defense counsel objected on grounds that Jones had never met AG and that the testimony regarding delay in reporting was unscientific, lacked foundation, and failed to meet the Frye[2] standard. In its memorandum of authorities in support of the motion to exclude Jones's testimony, the defense noted:

> It has been presented to the Defendant, by the State that Kelly Jones is going to be called as an expert witness to testify that it is normal for alleged victims of child rape, or rape in general, to delay the reporting of the incident. The State is first presuming that the Defense will cross examine [AG] and try to impeach her for the delay in reporting the incidents. They intend to call Kelly Jones to explain to the jury that, according to studies, it is not unusual at all for these types of victims to delay in reporting incidents of sexual abuse.

(Emphasis added.) The memorandum objected to the testimony on the same grounds noted in counsel's declaration. The defense did not dispute the State's understanding of its trial strategy, nor did the defense deny that it would impeach AG over her delay in reporting.

In its opposition to Gossett's motion to exclude Jones's testimony, the State explained:

> Because AG did not disclose her sexual abuse until June of 2008, when she turned 18 years old and was able to move out of the house, one of defendant's theories of the case is that AG lied by virtue of having waited to tell. Specifically, defendant plans to argue that because AG never told earlier and delayed her disclosure, this in and of itself is indicative of lying and seeks to challenge AG's

---

[2] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

-3-

<u>credibility</u>. The State anticipates that [Jones] will testify that not only is it commonplace for child victims of sexual assault to delay disclosure of their abuse, but it is equally common for these individuals to deny the fact that the sexual abuse even occurred.

(Emphasis added.) The State further argued, "Here, the defendant will be arguing that AG's allegations are false because she delayed disclosure. . . . [T]he state's expert should be allowed to testify since it is offered to rebut the defense theory that AG's delayed disclosure suggests she's lying."

In its response brief to the State's opposition, the defense again argued that the proposed expert testimony lacked scientific foundation and was inadmissible under <u>Frye</u>. The defense also responded to the State's comments on its theory of the case:

> Finally, the State simplifies the defense position in regard to the complaining witness statements. The defense does not contend that the witness lacks credibility because she did not disclose. The defense position is more nuanced. The complainant has considerable knowledge of the system, and of the protections that are available. With these in mind, the complainant did disclose, but disclosed actions that had nothing to do with defendant. Only when the disclosures that complainant was making were insufficient to achieve her ends, did she escalate the accusations.

Despite the claim that the State misunderstood its argument, the defense never denied that it intended to question AG about her delay in reporting the sexual abuse.

At the hearing on the defense motion to exclude Jones's testimony, defense counsel argued:

> The defendant Mark Gossett is charged with I believe it's two counts of child molestation and two counts of rape of a child, four incidents that occurred over a three- or four-year period of time. <u>And the alleged victim, [AG], moved out of the family home in January of 2008 and had not ever disclosed what she alleges was going on during the time it was supposedly going on and did not disclose anything until early June of . . . 2008. And in anticipation that the defense would be cross-examining the alleged victim and arguing that there was a delay in such reporting and therefore it must not be true</u>, the state has indicated that it's their intent to call, for lack of a better word, an expert to testify apparently that the -- a

> delay in reporting is not unusual in these types of cases. It's our position that that is not the proper subject of expert testimony under Evidence Rule 702 and 703, and also under State v. Black, [109 Wn.2d 336, 745 P.2d 12 (1987)].

RP (Apr. 1, 2010) at 12-13 (emphasis added). Defense counsel argued, consistent with the defense briefing on the issue, that Jones's testimony was unscientific and inadmissible under Frye. The State responded,

> [Defense] [c]ounsel would like to exclude expert testimony because he wants to use the fact that [AG], the victim in this case, delayed reporting and therefore is indicative of her credibility. Well . . . the Frye standard does not apply, not only when the witness bases his or her testimony on their own experience, training and observations, but also when it goes to rebut the defense theory that the delay in reporting shows that the victim's allegations were false.
>
> . . . .
> . . . . The Frye standard just doesn't apply and [Jones's] testimony's relevant based on their defense theory.

RP (Apr. 1, 2010) at 21-23. Defense counsel never disputed the State's account of the defense's theory of the case and trial strategy during the hearing. The court reserved ruling on the motion until after jury selection.

Meanwhile, the defense trial brief, filed April 19, indicated the defense intended to cross-examine AG regarding her delay in reporting the sexual abuse. See Clerk's Papers (CP) at 92 ("[AG] never told anyone anything about any problems with her father, Mark Gossett" until disclosing the abuse to Jennifer Myrick and "on or about June 2, 2008, [AG] allegedly disclosed to Jennifer Myrick and . . . [Roberta] Vandervort, that she had been being [sic] sexually abused by Mark. This was the first time that [AG] had ever told anybody that she had been sexually abused by Mark."); CP at 93 ("It is the intent of the defense to show how unlikely is it that Mark sexually abused [AG] and also how unlikely it is that she is telling the truth. In that vein, the defense intends to introduce evidence about all of the things mentioned herein . . . . The defense will also

-5-

introduce evidence that will make it highly unlikely that this abuse occurred, that [AG] has told people different scenarios and that once she made the alleged disclosure to Jennifer Myrick and [Roberta] Vandervort, she would tell people that she hardly knew that she had been sexually abused by Mark Gossett.").

The court revisited the motion to exclude expert witness testimony on April 19. Defense counsel informed the court:

> My understanding is that if [Jones is] being called - - I guess I'll say, my understanding is the expectation by the State is that [AG] will be cross-examined on her delay in reporting, and, therefore, this expert will come to say that that's basically not abnormal, that it's fairly common. . . .
> And so my position is, again, that we don't know if [Jones's] expertise covers that area, because it's not necessary in dealing with the treatment that she provides.

RP (Apr. 19, 2010) at 31-32 (emphasis added). The prosecutor responded,

> Your Honor, the State had not only briefed this extensively - - I don't know if counsel read it, but on page three, I'm very explicit in stating what the State anticipates Ms. Jones will testify to, not only about the disclosure of abuse, that it's equally delayed, but also children often recant or deny disclosure of the sexual abuse at all. . . .
>
> . . . .
> . . . . And the State submits that because counsel, and even in his trial brief filed - - I'm not certain when. I received it today, but it's dated the 19th, for today, Your Honor. I'm not sure if the Court received this trial brief from counsel. But he also states that it's the defense theory that they're going to be calling out [AG], the victim in this case, as a liar because she didn't report fast enough.

RP (Apr. 19, 2010) at 32, 34-35 (emphasis added). The prosecutor continued, "[B]ecause defense has brought up the issue about the victim's credibility in arguing that the delayed disclosure in and of itself is proof that she's lying - - that brings up an issue where the State should be allowed to bring an expert to rebut that issue alone. RP (Apr. 19, 2010) at 37. Again, the defense did not refute the State's understanding of

the defense strategy. The court denied the defense motion but allowed defense counsel to voir dire the witness outside of the jury's presence before her testimony.

Gossett was convicted of fourth degree assault involving TG, one of the Gossetts' former foster children. Immediately before trial, the court addressed the parties' pretrial motions and then asked whether the parties had any other issues to address. The State confirmed its intent to introduce evidence of Gossett's prior conviction and other alleged abuse in the Gossett household:

> Your Honor, there was a stipulation way back in August of '09. The State had filed an ER 404 brief regarding the domestic violence that was going on inside the Gossett family, and I think that, on a number of levels, the State would like to bring it up in the State's case in chief. And at the time that we were ready to argue this motion way back in front of Judge Pomeroy, counsel said, oh, we're going to stipulate. We put on the record there was a stipulation. There was no argument as to whether or not the information would come in. There's no outlay of how it would come in. There is no anything. Then here we get to last week, and I had mentioned it in chambers, Your Honor, that I thought that might be a new issue, the stipulation as to the - - and what I'm specifically talking about is Linda Gossett repeatedly beat all the children, specifically [AG] and the other children that were adopted, and that the defendant had beaten the other children, including [AG] and [TG], who was eventually removed from their home by DSHS, and his adoption was reversed because of the beatings, and [the defendant] has a conviction of it as well from 2007.
>
> And so I would submit that the conviction itself, should Mr. Gossett come to testify, would be a proper source of impeachment not under ER 609, not because it's a [crime of dishonesty], but because it goes to rebut an assertion that he is a peaceful man. And second of all, the generalized domestic violence in the house, it goes to show why [AG] would not tell hardly anyone because she feared she would be beaten repeatedly. And she even states, as outlined in the police record, she tried to tell a counselor - - when [TG] was being investigated for his abuse, she tried to tell a counselor, and Linda Gossett specifically challenged her and beat her right after learning that she was trying to tell the counselor that came to the home for a home visit.

RP (Apr. 19, 2010) at 59-61 (emphasis added).[3] Defense counsel responded:

---

[3] The State's ER 404 memo is found at Clerk's Papers 20-26. The State argued for admission of Gossett's prior conviction on several grounds, including (1) "The

> Your Honor, I just looked at counsel's 404(b) motion - - not her motion, but a memorandum. It has to do with what she talked about, and I did not object to that on the basis of 404(b). What I said in chambers and what I told her is, if the manner in which you attempt to get it in is objectionable for some other reason, for example, hearsay or anything like that, I'm going to object on that basis. But in terms of it being a prior bad act, I don't object to that.

RP (Apr. 19, 2010) at 61-62 (emphasis added). Defense counsel continued:

> I have been assuming - - and maybe this is incorrect, but I have been assuming that [AG] is going to testify about physical abuse in the family. So if that's how it comes in, then I don't have a problem with that. She either experienced it herself or she saw it.

RP (Apr. 19, 2010) at 62 (emphasis added). Defense counsel later clarified, "If [Gossett has] a prior conviction, I've agreed that can come in, but it still has to come in properly." RP (Apr. 19, 2010) at 63. Again, at no time did defense counsel dispute the State's account of the defense trial strategy.

At trial, the State introduced—and the court admitted—evidence of Gossett's prior child abuse charge and conviction involving TG. See RP (Apr. 19, 2010) (detective Chris Ivanovich testimony); RP (Apr. 20, 2010) at 336 (AG testimony). The State also introduced evidence of Linda's strict disciplinary tactics and the Gossett family home dynamics—including allegations that Linda beat the children—and the

---

defendant has already given the state notice of their intent to bring essentially their entire church in to testify as to [the Gossetts'] good and peaceful nature as loving adoptive parents. . . . [T]his [prior conviction] information tends to reveal the real defendant's true nature as it rebuts his claim that he was a loving, God-fearing parent who would never do the horrific acts that he's accused of" and (2) "If the defendant was never violent, his threat [that there would be hell to pay if AG told anyone about the abuse] might have been perceived as just a hollow threat, however, in the context of his routine violence, his threat was absolutely real and tangible—thus explaining why AG never told authorities of her physical and sexual abuse when they came to investigate TG's abuse, and why she waited until she could leave the house at 18 years old before she told." Our record contains no defense response to this memo and no transcript or contemporaneous written record of the stipulation.

defense cross examined the State's witnesses on those topics. See RP (Apr. 19, 2010) at 215, 223 (David Glidewell testimony); RP (Apr. 20, 2010) at 276-85, 303-05, 315-16, 330, 354-55, 365-66 (AG testimony); RP (Apr. 21, 2010) at 459-60 (AG), 562-64 (Jennifer Myrick testimony).

The defense introduced evidence of Gossett's past extramarital affair. Defense counsel also questioned Gossett about his prior child assault conviction, and Gossett admitted he entered an Alford[4] plea to fourth degree assault of a child involving TG. Gossett also acknowledged TG was removed from the Gossetts' home. The State cross-examined Gossett regarding his prior conviction and his extramarital affair. The State also cross-examined Linda regarding Gossett's prior conviction and the family's treatment of TG.

The trial record confirms that defense counsel repeatedly raised the issue of AG's failure to report and delay in reporting the sexual abuse. See RP (Apr. 20, 2010) at 247-48 (defense counsel cross-examined David Glidewell):

> Q. And so during that four-month period or whatever it was [between AG moving out and her disclosure of the sexual abuse], [AG] hadn't told you anything to lead you to believe she was in any kind of danger at all?
> A. She was very vague, but, no. That's correct."
>
> . . . .
> Q. . . . . She didn't tell you anything about any kind of sexual abuse?"
> A. No.
>
> . . . .
> Q. And she doesn't say anything about being about being sexually abused by Mark to you?"
> A. No.

See RP (Apr. 20, 2010) at 351 (defense counsel elicited AG's testimony on cross-examination that she knew the State had the power to rescue children from a house that

---

[4] North Carolina v. Alford, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

wasn't healthy); RP (Apr. 20, 2010) at 365-69 (defense counsel cross-examined AG regarding why she never told anyone about the sexual abuse); RP (Apr. 21, 2010) at 427 (defense counsel cross-examined AG: "Yet, when you did go to Jennifer Myrick's house a few days later and for the next several months, you didn't tell her everything that was going on?" AG: "Yes, sir." ); RP (Apr. 21, 2010) at 428 (same regarding AG not telling her sister SG about the abuse); RP (Apr. 21, 2010) at 429-31 (same regarding AG not telling close friends or family friends); RP (Apr. 21, 2010) at 439-40 (same regarding AG not telling Myrick about the abuse until several months after moving in with her); RP (Apr. 21, 2010) at 446-47 (AG confirmed that before June 2008 she had a lot of contact with people she trusted, and defense counsel asked, "Well, you didn't tell them about Mark or Linda?"); RP (Apr. 21, 2010) at 471 (defense counsel: "And during the time that you're talking about reconciling with the Bowkers and talking to Mark and so forth, you never mentioned that Mark was sexually abusing you?" AG: "No, sir.") RP (Apr. 21, 2010) at 477 (defense counsel asked AG whether she had told Laura or Bill Chase about the physical or sexual abuse); RP (Apr. 21, 2010) at 484 (defense counsel to AG: "Why did you wait so long to tell [Vandervort], somebody who -- if anybody would be on your side and protect you, it would be her; wouldn't you agree with that?"); RP (Apr. 21, 2010) at 489 (defense counsel to AG: "Well, if you made the decision to disclose [to Vandervort and Myrick], why did it take so long to get it out of you in the bedroom? Why didn't you just go up and tell [Myrick]?"); RP (Apr. 21, 2010) at 490 (defense counsel to AG: "Why didn't -- once you decided to disclose, why didn't you just go to the police?"); RP (Apr. 21, 2010) at 509-19 (defense counsel questioned why AG never told her high school counselor or her friends about the sexual abuse); RP

-10-

(Apr. 21, 2010) at 549 (defense counsel to AG: "Had you told them -- the people that were telling you or asking you to reconcile [with the Gossetts], had you told them that there were any family problems other than Linda?"); RP (Apr. 21, 2010) at 597-98 (defense counsel cross-examined Jennifer Myrick regarding why AG delayed reporting sexual abuse despite her close relationship with Myrick); RP (Apr. 23, 2010) at 986-87 (defense counsel asked SG on direct-examination whether AG ever told her about sexual abuse); RP (Apr. 28, 2010) at 1271-72 (Carol Benek testified that AG never reported being physically or sexually abused by the Gossetts), RP (Apr. 28, 2010) at 1305-06, 1316-17 (AG's friends testified she never mentioned physical or sexual abuse); RP (Apr. 28, 2010) at 1355 (Laura Chase testified that AG never hinted that she had been sexually abused).

During closing argument, the prosecutor made several statements that Gossett now argues constitute prosecutorial misconduct. Gossett explains the basis for his challenge and quotes the allegedly improper statements in his PRP brief:

> During closing arguments to the jury, the prosecutor continually engaged in prosecutorial misconduct, from arguing a conviction based on propensity, to using defamatory comments directed at Mr. Gossett, his wife, and the church that they attended. All of which had nothing to do with the elements of the offenses, but was merely designed, in a "scorched earth" argument, to appeal to the passions and prejudices of the jury.
>
> Specifically, at various points she argued, in attacking Linda and Mark Gossett's credibility:
>
> > What do we know about the Gossetts? They beat the hell out of [TG] for missing a word. He was locked in a car, beaten with a wooden spoon, beaten with a belt, beaten with a piece of scrap wood, for God's sake. He was removed from the house because he was beaten by his family, and particularly this defendant, and he's convicted for it.
>
> RP 1425:4-10.
>
> > They're vindictive people, folks.
>
> RP 1439:13-15.
>
> > . . . it's hell living with the Gossetts.

RP 1442:1-3.

Her relationship with the abuser, her relationship with Mark Gossett, is such that on the physical abuse scale, Linda is much more heinous, much more brutal with the kids on a regular basis right? We know that. We know that by Linda's testimony, by [AG]'s, even [SG]. We know that Linda is beating everybody, especially [TG], especially [AG]. Those are the bad kids, right? They're the ones getting the brunt of it.

RP 1445:12-23.

And what does the affair tell you about his Personality? It tells you a lot of stuff about him. Number one, he's got very poor sexual boundaries right? Very poor judgment. Okay. Number two, he's willing to violate the trust of the family member, his wife. All right. Number three, his needs are not being met by his wife, because he's seeking sex from some other source. And, in this case, we know by his own admission it's outside of the marriage, right? But we also know from [AG] that he's getting it from her as well.

And what else do we know? Well, he's willing to violate the trust of his beloved church, the covenants of his church. He's willing to violate that. He has no problem violating the trust of anybody. The kids that he beats, the child he molests, the church he's supposed to express faith and covenants of and the trust of his wife, he has no problem violating all of that.

RP 1449:1-19.

"Did you hear from any of their little churchy friends that came up and testified for them . . . "

RP 1450:16-17.

And then what is the response of the non-offending person? That's mommy dearest, Linda Gossett. What's her response? Well, [AG] was so afraid that Linda was going to find out, because she thought she would be beaten even worse. Right? . . .

And by the way, the heavy-iron-fisted Linda Gossett is going to do it.

RP 1446:24-1447:7.

And the beauty of having a group conform through oppression is that you only need to make an example out of one person. That's what the army does, right? You punish one for the whole group, they get to see what happens to that one. Well, that's what the Gossetts did. They beat on [TG]. They beat on [AG]. All the other kids conformed because they knew.

RP 1447:15-22.

And what do we know about Linda? She expects perfection. She's a domineering, controlling, very abusive and brutal parent. . . . Do you think all of them were going to be wanting to play the violin? You know, Guitar Hero is a hit, but violin hero is even better, right? No. No. Violin was the chosen instrument. . . .

What about [AG]? Everybody is magically involved in the Thurston County Youth Football League. . . . We know that they're all kind of glommed like this little Brady Bunch at each little place. There's no individuality. There's no individuality. There's no choices anywhere. Do you notice that about that whole family?

Linda expects complete obedience as well . . . She's also overwhelmed by the fact she has to take care of everything. She's pissed off at her husband . . . .

RP 1453:2-1454:8.

In addition to these arguments, the prosecutor essentially argued that Mr. Gossett should be convicted because of propensity based on other bad acts, all of which was admitted without objection by defense counsel. For example, the prosecutor continually argued all of the "corporal punishment" suffered by all of the children at the hands of Linda Gossett supported a finding against Mr. Gossett. The justification for the argument apparently was, as argued by the prosecutor:

What do we know about the Gossetts? It's way more than that. Their version of [a] little tap leaves bruises. We know that. And they have this signature about them, the Gossett signature. And it's not that they did it in the past, they're going to do it again. But what do we have? We have a great example from [TG]. You know, years later, in 2007, leopards don't change their spots, folks. They carry on until they're forced to change, right?

RP 1424:19-1425:4.

What do we know about the Gossetts in general? Well, past behavior is the best predictor of future behavior.

RP 1439:16-18.

It is one thing to cause pain and suffering of a child, but then to hinder them on top of that from getting help, to getting a better family, to recovering from their abuse, that's another. And that's what the Gossetts are all about. They're all about making their kids pay. And they did the same thing to [AG].

That's their signature, folks. They like to make their kids pay.

RP 1440:11-23.

The prosecutor went so far as to argue that all of Mr. Gossett's conduct "violated the trust of his beloved church, the covenants of his church. He's willing to violate that." RP 1449:12-19. This included the physical abuse to the kids, and the affair that was admitted into evidence.

PRP at 8-11.

Defense counsel made no objections to these statements. Instead, during his closing remarks, defense counsel forcefully rebutted each of the prosecutor's

statements and reminded the jury to rely on the court's instructions. See RP (Apr. 29, 2010) at 1458 ("[I]t is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is testimony and the exhibits.");[5] RP (Apr. 29, 2010) at 1459 (noting that the prosecutor's statements were not evidence); RP (Apr. 29, 2010) at 1461 (refuting prosecutor's statement that past behavior predicts future behavior, noting, "This case is not about [TG]. Mark Gossett is not on trial for [TG]. . . . Linda is not on trial here. . . . Corporal punishment is not on trial here. . . . Their church is not on trial here."); RP (Apr. 29, 2010) at 1461-62 (noting that 80 percent of prosecutor's argument was aimed at making Gossett look bad and explaining that bad parenting was not the issue in the case); RP (Apr. 29, 2010) at 1473 ("Just because counsel says and AG says she was constantly being beaten doesn't mean it's true."), 1477 (rebutting prosecutor's argument about the violin lessons), 1509 ("no matter what you think about Mark and what you think about Linda, you must decide this case on the evidence that was presented"), RP (Apr. 29, 2010) at 1510 (noting that the allegations had "nothing to do with whether Linda hit [AG] or [TG] or whether Mark or Linda are bad parents").

---

[5] Here, defense counsel referred the jury to the court's instruction 1. This instruction informed the jury in part:

> The lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits. The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.

The court further instructed the jury, "You must not let your emotions overcome your rational thought process. You must reach your decision based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference." We presume that the jury follows the court's instructions. State v. Swan, 114 Wn.2d 613, 662, 790 P.2d 610 (1990).

-14-

Defense counsel also highlighted inconsistencies in the testimony regarding Linda's alleged abuse of AG to argue that AG lacked credibility. Further, defense counsel used AG's failure to report and delay in reporting as a constant theme during closing argument. See RP (Apr. 29, 2010) at 1471 (questioning why AG failed to disclose the sexual abuse to people she trusted); RP (Apr. 29, 2010) at 1487 ("And if [AG] had consciously decided to disclose, according to the testimony we have, why did Bobby Vandervort have to pry it out of her? Why didn't she go with the safe environment she was in with Jennifer Myrick and tell her?"); RP (Apr. 29, 2010) at 1489 ("Now, I want to talk about, again, from a different perspective the fact that there were no disclosures to anybody during this entire period of time . . . ."); RP (Apr. 29, 2010) at 1491-92 (highlighting AG's failure to report to Keith Meyer, Carol Benek, or Laura Chase); RP (Apr. 29, 2010) at 1500-01 (questioning AG's reasons for not reporting), 1503 (arguing that AG had no reason to delay reporting because she knew disclosure would result in her being removed from the allegedly abusive situation); RP (Apr. 29, 2010) at 1508-09 (refuting the expert witness testimony regarding delay in reporting).

The jury convicted Gossett as charged. In his direct appeal, Gossett challenged his convictions on several grounds, including two grounds relevant to this PRP—prosecutorial misconduct and ineffective assistance of counsel. Specifically, Gossett argued that the prosecutor improperly shifted the burden of proof and presented the jury with a false choice by arguing during closing argument, "It comes down to whether or not you really believe [AG]." Gossett, 2012 WL 830507, at *2. He further argued that he received ineffective assistance of counsel when defense counsel failed to object to this same portion of the prosecutor's closing argument. Gossett, 2012 WL 830507 at

*3. In his pro se statement of additional grounds, Gossett added several prosecutorial misconduct grounds, alleging that the prosecutor (1) made false statements during closing argument, (2) used impeachment as a guise for submitting substantive evidence to the jury, (3) improperly expressed her personal belief as to witness credibility, and (4) knowingly elicited false testimony from AG. Gossett, 2012 WL 830507 at *5-7.

Division Two of this court affirmed Gossett's convictions, and our Supreme Court denied his petition for review. Gossett, 2012 WL 830507 at *8; State v. Gossett, 174 Wn.2d 1018, 282 P.3d 96 (2012). Gossett timely filed this PRP. In his PRP, Gossett argues he is entitled to a new trial based on prosecutorial misconduct and ineffective assistance of trial counsel. Gossett's PRP identifies different facts than those he asserted in his direct appeal in support of these claims. Regarding prosecutorial misconduct, he now cites the portions of the State's closing argument quoted above and claims that the prosecutor "committed numerous instances of misconduct during closing arguments that were designed to appeal to the passion and prejudice of the jury and argued for a conviction based on evidence admitted under ER 404(b) because it demonstrated propensity to commit the acts for which he was charged." PRP at 12 (capitalization omitted). Regarding ineffective assistance, he claims defense counsel (1) failed to object to admission of ER 404(b) and ER 608 evidence or require the court to follow the procedures required for its admission and (2) failed to object to the instances of alleged prosecutorial misconduct during closing argument.
Gossett "concedes that typically grounds that were already addressed on direct appeal cannot be resurrected via a Personal Restraint Petition." PRP at 20. However, he claims that we should reach the merits of his current arguments because (1) he was

-16-

denied effective assistance of appellate counsel because "the grounds of ineffective assistance of trial counsel and prosecutorial misconduct brought on direct appeal were not adequately raised on direct appeal and he has suffered actual prejudice as a result" and (2) "the ends of justice require that the court allow relitigation of the issues." PRP at 23.

## ANALYSIS

### Standard of Review

"Generally, to be entitled to relief, a timely PRP petitioner must establish 'either that he or she was actually and substantially prejudiced by constitutional error or that his or her trial suffered from a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice.'" In re Pers. Restraint of D'Allesandro, 178 Wn. App. 457, 469, 314 P.3d 744 (2013) (footnote omitted) (quoting In re Pers. Restraint of Finstad, 177 Wn.2d 501, 506, 301 P.3d 450 (2013)). Courts apply this heightened standard of review to promote finality when the petitioner has had previous opportunities for judicial review.[6] See In re Pers. Restraint of Coats, 173 Wn.2d 123, 132, 267 P.3d 324 (2011) (heightened standard); In re Pers. Restraint of

---

[6] Under this standard, a personal restraint petitioner may not renew an issue that he raised and an appellate court rejected on the merits in a direct appeal unless the interests of justice require relitigation of that issue. In re Pers. Restraint of Taylor, 105 Wn.2d 683, 688, 717 P.2d 755 (1986); State v. Pierce, 155 Wn. App. 701, 712-13, 230 P.3d 237 (2010). In order to bar a PRP, "the prior denial must have rested on an adjudication of the merits of the ground presented in the subsequent application."[6] Taylor, 105 Wn.2d at 688 (citing Sanders v. United States, 373 U.S. 1, 16, 83 S. Ct. 1068, 10 L. Ed. 2d 148 (1963)). "[T]he mere fact that an issue was raised on [direct] appeal does not automatically bar review in a PRP. Rather, a court should dismiss a PRP only if the prior appeal was denied on the same ground, and the ends of justice would not be served by reaching the merits of the subsequent PRP." Taylor, 105 Wn.2d at 688. "Ground" refers to "a distinct legal basis for granting relief." Taylor, 105 Wn.2d at 688.

Isadore, 151 Wn.2d 294, 299, 88 P.3d 390 (2004) (no prior opportunity for review); In re Pers. Restraint of Cook, 114 Wn.2d 802, 810–12, 792 P.2d 506 (1990)).

"But when, as is the case in an ineffective assistance of appellate counsel claim, the petitioner has not had a previous opportunity to obtain judicial review, this heightened standard does not apply." D'Allesandro, 314 P.3d at 751. "[A] criminal defendant has a right to have effective assistance of counsel on his first appeal of right." In re Pers. Restraint of Dalluge, 152 Wn.2d 772, 787, 100 P.3d 279 (2004). A defendant's first opportunity to raise an ineffective assistance of appellate counsel claim is often on collateral review. Dalluge, 152 Wn.2d at 787. To prevail on such a claim, petitioners must show "'that the legal issue which appellate counsel failed to raise had merit and that they were actually prejudiced by the failure to raise or adequately raise the issue.'" Dalluge, 152 Wn.2d at 787 (quoting In re Pers. Restraint of Maxfield, 133 Wn.2d 332, 344, 945 P.2d 196 (1997)). Our Supreme Court explained:

> Failure to raise all possible nonfrivolous issues on appeal is not ineffective assistance, and the exercise of independent judgment in deciding what issues may lead to success is the heart of the appellate attorney's role. Yet if a petitioner can show that his appellate counsel failed to raise an issue with underlying merit, then the first prong of the ineffective assistance test is satisfied.
> . . . .
>
> . . . .
> Under the second prong of the ineffective assistance of appellate counsel test, this court has required that the petitioner show that he was "actually prejudiced by the failure to raise or adequately raise the issue." In Smith v. Robbins, 528 U.S. 259, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000), the United States Supreme Court reiterated that the proper standard for evaluating claims of ineffective assistance of appellate counsel derives from the standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Smith, 528 U.S. at 285. The Court held that Robbins was required to demonstrate prejudice, "[t]hat is, he must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal." [Smith, 528 U.S.] at 285-86 (emphasis added) (the Supreme Court's requirement that the defendant must show "'a reasonable

-18-

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'") (emphasis added) (quoting Strickland, 466 U.S. at 694).

Dalluge, 152 Wn.2d at 787-88 (some internal citations omitted).

Generally the remedy for ineffective assistance of appellate counsel is reinstatement of the appeal and remand. In re Pers. Restraint of Frampton, 45 Wn. App. 554, 563, 726 P.2d 486 (1986). Gossett's ineffective assistance of appellate counsel claim requires us to consider whether his two current challenges—ineffective assistance of trial counsel and prosecutorial misconduct—had merit, and if so, whether Gossett was actually prejudiced by appellate counsel's failure to adequately raise these issues on direct appeal. Dalluge, 152 Wn.2d at 787.

Ineffective Assistance of Trial Counsel

Gossett claims he was denied effective assistance of trial counsel when counsel stipulated to the admissibility of evidence regarding his prior conviction, failed to object to other evidence of Linda's prior conduct, and failed to request a limiting instruction for this evidence. To establish ineffective assistance of counsel, Gossett must show both deficient performance and resulting prejudice. Strickland v. Washington. 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). There is a strong presumption of effective representation. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Matters that go to trial strategy or tactics do not show deficient performance, and Gossett bears the burden of establishing there were no legitimate strategic or tactical reasons behind his attorney's choices. State v. Rainey, 107 Wn. App. 129, 135-36, 28 P.3d 10 (2001).

Under ER 404(b), evidence of a defendant's other crimes or bad acts is not admissible to prove his character as a ground for suggesting that his conduct on a particular occasion was in conformity with it. Any evidence used to show conformity with past actions is subject to ER 404. State v. Everybodytalksabout, 145 Wn.2d 456, 467-68, 39 P.3d 294 (2002). But such evidence may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). Further, ER 404(a)(1) permits "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same." (Emphasis added.)

At trial, defense counsel did not object to the evidence of Gossett's prior fourth degree assault conviction and other prior bad acts (marital affair[7] and physical abuse) or to evidence of Linda's parenting tactics.[8] Counsel also requested no limiting instruction relating to this evidence. The decision to object, or to refrain from objecting even if testimony is not admissible, is a tactical decision not to highlight the evidence to the jury. It is not a basis for finding counsel ineffective. State v. Madison, 53 Wn. App. 754, 763, 770 P.2d 662 (1989) ("The decision of when or whether to object is a classic

---

[7] To the extent Gossett argues defense counsel was ineffective for introducing evidence that he previously had an extramarital affair and admitted that fact to Linda, he fails to show counsel lacked a legitimate tactical reason for doing so. The record shows defense counsel asked Gossett about the affair in an attempt to portray him as someone who admitted his wrongs—even though he could have denied the affair to Linda because no proof existed. Defense counsel also elicited Gossett's testimony that he and Linda "talked it out" and that the Gossett family in general encouraged everyone to talk out their problems and not fight.

[8] Gossett fails to show that the trial court would have sustained his objections even if asserted at the time under the circumstances here.

example of trial tactics. Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal."). "Similarly, our case law recognizes that the decision to decline a limiting instruction for ER 404(b) evidence likewise is a tactical decision not to highlight damaging evidence."[9] State v. Kloepper, ___ Wn. App. ___, 317 P.3d 1088, 1094 (2014); see also State v. Yarbrough, 151 Wn. App. 66, 210 P.3d 1029 (2009) (failure to propose a limiting instruction presumed to be a legitimate trial tactic not to reemphasize damaging evidence); State v. Price, 126 Wn. App. 617, 649, 109 P.3d 27 (2005) ("We can presume that counsel did not request a limiting instruction" for ER 404(b) evidence to avoid reemphasizing damaging evidence); State v. Barragan, 102 Wn. App. 754, 762, 9 P.3d 942 (2000) (failure to propose a limiting instruction for the proper use of ER 404(b) evidence of prior fights in prison dorms was a tactical decision not to reemphasize damaging evidence).

Because we strongly presume that defense counsel's conduct constituted sound trial strategy, Gossett carries a heavy burden to demonstrate that, in light of the entire record, no legitimate strategic or tactical reasons support counsel's stipulation, failure to object, and failure to request a limiting instruction under these circumstances. State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995); Barragan, 102 Wn. App. at 762 (A criminal appellant challenging trial counsel's effectiveness based on counsel's decision not to request a limiting instruction bears the burden of proving there was no legitimate tactical reason for that decision). Gossett fails to meet this burden.

---

[9] The trial court is not required to give such an instruction sua sponte. State v. Russell, 171 Wn.2d 118, 123-24, 249 P.3d 604 (2011).

Our record does not reflect the basis for counsel's stipulation to the prior

conviction evidence, but we presume this decision flows from counsel's clearly tactical

decision to (1) attack AG's credibility by highlighting her failure to report and delay in

reporting the sexual abuse and (2) introduce evidence of Gossett's loving and gentle

character. This trial tactic opened the door for the State to present evidence (1)

explaining AG's failure to report or delay in reporting the sexual abuse and (2) rebutting

the defense's portrayal of Gossett's character as discussed below.

First, evidence of prior abuse of the victim or others by the defendant is

admissible to aid the jury in evaluating the credibility of a victim who delays reporting.[10]

---

[10] See State v. Baker, 162 Wn. App. 468, 474-75, 259 P.3d 270 (2011) (prior acts of domestic violence between defendant and victim are admissible to assist jury in assessing credibility of victim who delays reporting, changes her story, or minimizes the degree of violence due to fear of the defendant); State v. Grant, 83 Wn. App. 98, 105-06, 920 P.2d 609 (1996) (evidence of defendant's prior assaults against victim admissible under ER 404(b) if relevant and necessary to assess victim's credibility as a witness and prove that the charged assault actually occurred). Further, evidence of prior abuse that bears on a victim's credibility may include abuse of others that causes fear for the current victim. State v. Nelson, 131 Wn. App. 108, 114-16, 125 P.3d 1008 (2006).

Gossett claims, "Defense counsel never made an issue of the victim's delayed reporting" and further asserts that "delayed reporting . . . was never argued to the jury." PRP at 15; Reply Br. to PRP at 5. The record flatly contradicts this assertion as discussed above. Regarding the delayed reporting issue, Gossett also argues this case is similar to State v. Fisher, 165 Wn.2d 727, 202 P.3d 937 (2009). In Fisher, the defendant was charged with molesting his stepdaughter. Fisher, 165 Wn.2d at 733. The State sought to admit under ER 404(b) evidence of the defendant's prior physical abuse of his other children to explain the victim's delayed reporting. Fisher, 165 Wn.2d at 734. The trial court ruled that the prior misconduct was inadmissible unless the defense raised the delayed reporting. Fisher, 165 Wn.2d at 734. On appeal, the defendant argued that the ER 404(b) evidence's prejudicial effect outweighed its probative value. Fisher, 165 Wn.2d at 744-46. Fisher held that given the circumstances, the trial court did not abuse its discretion by making the prior misconduct's admissibility contingent on the defense first making an issue of the victim's delayed reporting. Fisher, 165 Wn.2d at 746. The Supreme Court explained, "Only if defense counsel made an issue of [the victim's] delayed reporting did the physical

Failure to object to admissible evidence does not establish ineffective assistance of counsel. State v. Alvarado, 89 Wn. App. 543, 553, 949 P.2d 831 (1998). As discussed above, the State offered the evidence for highly relevant purposes. The record amply demonstrates that the evidence was not admitted to show Gossett's bad character or that he acted in conformity with that character. The evidence was admissible to explain AG's delay in reporting the sexual abuse. Gossett fails to show counsel lacked a legitimate basis to stipulate to the prior conviction's admissibility.

Similarly, Gossett fails to show counsel's stipulation and failure to object to evidence of abuse by both Gossett and Linda constitutes ineffective assistance of counsel given counsel's tactical decision to elicit testimony regarding Gossett's alleged nonviolent character and the family dynamics. The trial record is replete with examples of this strategy. See RP (Apr. 22, 2010) at 823-24 (Gossett testified that he would comfort the children after disciplining them and went easier on the kids than Linda did); RP (Apr. 23, 2010) at 947 (Mark Wilton testified that the Gossett family "[g]ot along just fine," "everybody got along," and was "a happy family"); RP (Apr. 23, 2010) at 953 (Mark

---

abuse become relevant to the determination of whether sexual abuse occurred." Fisher, 165 Wn.2d at 746. But the court did not hold that such a contingent ruling was required as a matter of law. Further, the court noted that prior misconduct was relevant to prove the alleged victim's state of mind and cited to Nelson with approval. Fisher, 165 Wn.2d at 744–45 (citing Nelson for the proposition that evidence of past physical abuse is admissible "to demonstrate the victim's fear of the defendant and explain the apparent inconsistency of the victim not reporting the full extent of the abuse earlier").

The State is entitled to anticipate matters of defense in its case in chief. State v. Anderson, 15 Wn. App. 82, 84, 546 P.2d 1243 (1976). We have recognized that the seemingly irrational or inconsistent conduct of a domestic violence victim implicitly raises the issue of the victim's credibility. Grant, 83 Wn. App. at 106-09. As discussed above, prior abuse evidence that assists the jury in evaluating a victim's credibility is highly relevant and therefore admissible. State v. Magers, 164 Wn.2d 174, 186, 189 P.3d 126 (2008); Baker, 162 Wn. App. at 474-75; Nelson, 131 Wn. App. at 114-16; Grant, 83 Wn. App. at 109.

Wilton testified that Gossett was "a very loving father" and a "very loving" person in general and Linda was "a loving mother"); RP (Apr. 23, 2010) at 985 (SG described Gossett as "Caring, sweet, soft, gentle. He never really yelled at anybody, just kind of goes with the flow with us."); RP (Apr. 27, 2010) at 1125 (Linda testified that Gossett "is very kind and gentle . . . . He was always very kind and gentle and loving with [the children]."); RP (Apr. 28, 2010) at 1302 (Mea Johnson described Gossett as "a fun-loving individual" whose relationship with AG was "no different than any other father or daughter"); RP (Apr. 28, 2010) 1315 (Rachel Carras testified that Gossett and AG "appeared to have a good father/daughter relationship" and Gossett was "nice"); RP (Apr. 28, 2010) at 1329 (Kristina Kauffman described Gossett as "laid back, a good father"); RP (Apr. 28, 2010) at 1345-1346 (Laura Chase described Mark as "incredibly calm," "a very, very hard worker," and "really looks out for [his family's] interest"); RP (Apr. 28, 2010) at 1361 (Laura Chase described the Gossetts as "very kind, giving people, and they love their children").

Under ER 404(a)(1) noted above, the State was entitled to present prior abuse evidence to rebut Gossett's nonviolent and loving character evidence. Without this evidence, Gossett's own character evidence "would have gained unwarranted credibility . . . ." State v. Wilson, 60 Wn. App. 887, 890, 808 P.2d 754 (1991) (prosecution for statutory rape and indecent liberties; trial court properly admitted evidence that defendant had assaulted the victim on previous occasions; evidence was admissible to show that the victim had reason to fear the defendant and that, therefore, a reason existed why the victim did not immediately report the incident to others). Counsel's

-24-

performance was not deficient for failing to object given counsel's tactical decision to open the door to such evidence.

Gossett also claims trial counsel's performance was deficient for failing to request a limiting instruction regarding the evidence of his prior conviction. As noted above, in the ER 404(b) context, we presume that counsel's failure to request a limiting instruction was a tactical decision because to request such an instruction would reemphasize the damaging evidence. Gossett points to nothing in the record indicating that his counsel did not consider and reject a limiting instruction request as a matter of trial strategy.[11] On the contrary, Gossett contends only that the evidence was highly prejudicial, potential propensity evidence. He fails to acknowledge that forgoing a limiting instruction could have been a tactical decision to avoid reemphasizing the evidence of his prior bad acts. Gossett fails to overcome the strong presumption that defense counsel's performance was adequate. Defense counsel's decision not to object or request a curative instruction in any of the instances Gossett now challenges "strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial." State v. Swan, 114 Wn.2d 613, 661, 790 P.2d 610 (1990). His ineffective assistance of counsel argument fails.

Finally, Gossett also fails to show counsel was ineffective for failing to object to evidence of Linda's parenting and disciplinary tactics, including alleged abuse of the

---

[11] We note that Gossett submitted no new evidence in this PRP, including no sworn testimony from trial or former appellate counsel.

adopted children.[12] The record shows counsel used inconsistencies in AG's allegations regarding Linda's behavior to question AG's credibility generally. Gossett fails to show absence of a legitimate trial strategy.

Prosecutorial Misconduct

Gossett argues the prosecutor's closing remarks quoted above inflamed the jury with passion and prejudice. Appeals to jury passion are inappropriate. State v. Belgarde, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988). A defendant alleging prosecutorial misconduct bears the burden of first establishing "the prosecutor's improper conduct and, second, its prejudicial effect." State v. Dhaliwal, 150 Wn.2d 559, 578, 79 P.3d 432 (2003).[13]

We review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. State v. Boehning, 127 Wn. App. 511, 519, 111 P.3d 899 (2005). Where the defense fails to timely object to an allegedly improper remark, the error is deemed waived unless the remark is "so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition

---

[12] Gossett claims the evidence regarding Linda's parenting style constitutes improper ER 608 evidence. ER 608(b) provides in essence that a party may not attack the credibility of a witness by extrinsic evidence of prior conduct, but the witness may be cross-examined as to his or her character for truthfulness or untruthfulness. Gossett's reliance on ER 608 is questionable. As discussed above and as the record shows, Mark and Linda Gossett's parenting and use of corporal punishment was properly admitted as to reasons for AG's delayed reporting and impeachment and to rebut Gossett's good character evidence and happy family life evidence.

[13] In this context, "prejudicial effect" means that there was a "substantial likelihood" that the challenged comments affected the verdict. State v. Reed, 102 Wn.2d 140, 145, 684 P.2d 699 (1984).

to the jury." State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994). Under this heightened standard, the defendant must show that (1) "no curative instruction would have obviated any prejudicial effect on the jury" and (2) the misconduct resulted in prejudice that "had a substantial likelihood of affecting the jury verdict." State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011).

In closing argument, the prosecutor is afforded wide latitude in drawing and expressing reasonable inferences from the evidence. State v. Hoffman, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991). State v. Lewis, 156 Wn. App. 230, 240, 233 P.3d 891 (2010). The prosecutor has especially wide latitude when rebutting an issue the defendant raised in closing argument. Lewis, 156 Wn. App. at 240.

Gossett acknowledges he failed to object to any of the challenged statements quoted above and, thus, it is his burden to show any claimed misconduct was so flagrant and ill intentioned that a curative instruction would not neutralize the prejudice. To the extent the prosecutor portrayed the Gossetts as vindictive, described Linda Gossett as controlling and domineering, and discussed the family dynamics in terms of oppression and conforming to the group, these statements were consistent with the admissible evidence and reasonable inferences drawn from the evidence presented at trial.[14]

---

[14] Gossett's argument that the "misconduct also included improper use of ER 404(b) and 608 evidence" also fails for the reasons discussed above. PRP at 14.

Gossett also claims the prosecutor appealed to religious prejudice when she referred to several defense witnesses as "little churchy friends"[15] and argued that Gossett was willing to violate the covenants of his church. Multiple witnesses, including numerous defense witnesses, testified about the Gossetts' church affiliation and church activities. Several of Gossett's church friends testified about knowing the Gossett family from church and opined about Gossett's good character. When viewed in the context of the evidence presented, the challenged statements fall well within the wide latitude both parties are granted.[16]

In addition, Gossett fails to adequately explain how any of the challenged statements resulted in prejudice and affected the verdict. Indeed, the record shows that the prosecutor's challenged statements were based in part on evidence presented by the defense as a critical part of its trial strategy. For example, the defense's cross-examination of AG aggressively sought to undermine her credibility based on her delayed reporting. AG's cross-examination testimony spanned well over 100 pages of trial transcript.

---

[15] We disagree. Gossett cites no controlling authority for this assertion. But the pejorative remarks by the prosecutor are unprofessional.

[16] Citing State v. Monday, 171 Wn.2d 667, 257 P.3d 551 (2011) and United States v. Cabrera, 222 F.3d 590 (9th Cir. 2000), Gossett contends the prosecutor's closing argument "appealed to religious prejudice, which violates the Fifth Amendment right to a fair trial." PRP at 14. Unlike in Monday and Cabrera, the improper comments here were not an open call to convict Gossett on the basis of racial, ethnic, or religious prejudices. Further, unlike in Monday, the prosecutor here did not seek to exploit or reinforce extensive misconduct that had occurred during trial. Nor did the misconduct "taint[ ] nearly every lay witness's testimony." Monday, 171 Wn.2d at 681.

Gossett also fails to establish that the prosecutor's alleged propensity arguments based on his prior bad acts and Linda's parenting style were flagrant and ill intentioned.[17] Review of the entire closing argument in context indicates that the prosecutor's alleged propensity arguments ("past behavior is the best predictor of future behavior" and "[t]hat's their signature") addressed the evidence indicating the Gossetts isolated and cut AG off from the family as a punishment when she ran away from home the final time. RP (Apr. 29, 2010) at 1439, 1440. Specifically, the prosecutor compared the Gossetts' previous action in "unadopting" TG to their behavior in cancelling AG's health insurance, cell phone, and car insurance—and evidence in the record supported both of those incidents. RP (Apr. 29, 2010) at 1439-41. Our review of the record shows that the prosecutor did not use the evidence to argue or infer that Gossett's prior child abuse conviction or other "bad acts" indicate he sexually abused AG.

Similarly, when viewed in context, the prosecutor's "leopard's don't change their spots" comment was directed at the Gossetts' parenting style and disciplinary tactics, not at proving the charged crimes.[18] RP (Apr. 29, 2010) at 1425. As discussed above, the corporal punishment and/or physical abuse evidence and the family dynamics evidence was relevant to explain why AG failed to report or delayed reporting the

---

[17] Even assuming the statements were improper, he fails to show prejudicial error under the circumstances here.

[18] We question whether the challenged evidence implicates the rule against propensity evidence encompassed within ER 404(b) because the State presented no evidence of any prior sexual assaults perpetrated by Gossett against any other victims. Nevertheless, as discussed above, this nonpropensity evidence was properly admissible.

abuse. The prosecutor further clarified, "And it's <u>not</u> that [the Gossetts] did it in the past, they're going to do it again." RP (Apr. 29, 2010) at 1424 (emphasis added).

Finally, the prosecutor's arguments regarding Gossett's extramarital affair addressed motive rather than propensity despite the prosecutor's use of the word "personality." <u>See</u> RP (Apr. 29, 2010) at 1449 (arguing that the affair showed Gossett's needs were not being met by his wife). The prosecutor's argument that the affair showed Gossett had poor sexual boundaries and was willing to violate the trust of a family member and the trust and covenants of his church may have been improper if read in isolation. However, the defense first introduced the marital affair evidence at trial and used that evidence to suggest Gossett was a trustworthy person for openly admitting the affair to Linda instead of hiding it. Under these circumstances, the prosecutor properly used the evidence to draw a contrary inference, especially given the wide latitude afforded the prosecutor in closing argument. <u>Hoffman</u>, 116 Wn.2d at 94-95.

Gossett fails to show that any improper statements were so flagrant and ill intentioned that a timely objection and limiting instruction could not have cured any prejudicial effect. Accordingly, his prosecutorial misconduct claim is waived. Even absent waiver, Gossett fails to establish prejudicial error—that the statements likely affected the verdict.[19]

---

[19] Gossett also claims trial counsel was ineffective for failing to object to the prosecutor's statements during closing remarks. Defense counsel's decision to refrain from objecting during the prosecutor's closing argument was not deficient performance. "Lawyers do not commonly object during closing argument 'absent egregious misstatements.'" <u>In re Pers. Restraint of Davis</u>, 152 Wn.2d 647, 717, 101 P.3d 1 (2004) (quoting <u>United States v. Necoechea</u>, 986 F.2d 1273, 1281 (9th Cir. 1993)). "A decision

PRP Resolution

Gossett brought this PRP in the context of an ineffective assistance of appellate counsel claim. For the reasons discussed above, Gossett's ineffective assistance of trial counsel and prosecutorial misconduct arguments lack merit. He thus fails the first prong of Deluge's test for proving appellate counsel was ineffective for failing to raise those arguments. Dalluge, 152 Wn.2d at 787. Appellate counsel exercised independent judgment in deciding the issues to raise on direct appeal. Appellate counsel filed a brief raising four issues and subsequently filed a petition for review once those issues were unsuccessful on appeal. Appellate counsel's decision not to pursue the claims raised on collateral attack does not establish that counsel's performance fell below an objective standard of reasonableness. We deny Gossett's PRP.[20]

## CONCLUSION

Because Gossett's ineffective assistance of trial counsel and prosecutorial misconduct claims lack merit, he fails to show that appellate counsel's failure to raise

---

not to object during summation is within the wide range of permissible professional legal conduct." Davis, 152 Wn.2d at 717. Defense counsel addressed the issue during closing argument, when, as noted above, counsel forcefully rebutted each of the prosecutor's statements and highlighted the relevant jury instructions. Counsel's decision not to object, but instead respond to the prosecutor's statements during closing remarks, can be characterized as a legitimate trial tactic. See State v. Madison, 53 Wn. App. 754, 763, 770 P.2d 662 (1989) ("The decision of when or whether to object is a classic example of trial tactics."). In sum, Gossett fails to show with reasonable probability that the result of the trial would have been different had defense counsel objected to the prosecutor's remarks at the time they were made.

[20] For the same reasons, Gossett fails to show that the interests of justice require relitigation of the issues raised here. Taylor, 105 Wn.2d at 688.

those arguments on direct appeal constituted ineffective assistance on appeal.  We deny Gossett's PRP.


WE CONCUR: